UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

YOU, XIU QING, aka YU, XIAN CHIN,

                              Petitioner,

        -against-

KIRSTJEN NIELSEN, in her official capacity as Secretary
of Homeland Security; THOMAS DECKER, in his official
capacity as New York Field Office Director for U.S.
Immigration and Customs Enforcement; STEVE
AHRENDT, in his capacity as Warden of New Jersey
Bergen County Jail; and MICHAEL SAUDINO, in his
capacity as Sheriff of Bergen County, NJ,

                              Respondents.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/2/2018

18 Civ. 5392

**OPINION**

ANALISA TORRES, District Judge:

On June 14, 2018, Petitioner, Xiu Qing You, a Chinese national, filed a petition for

habeas corpus following his arrest and detention pursuant to a final order of removal. *See* First

Am. Pet., ECF No. 5. By order to show cause hand-delivered to the Court on June 16, 2018,

Petitioner sought a temporary stay of removal, and, subsequently, Pet. Reply, ECF No. 16,

release from custody. At a show cause hearing on June 20, 2018, *see* Order to Show Cause, ECF

No. 11, the Court issued an oral order granting the requested relief pending the resolution of the

habeas petition, Order of Release, ECF No. 17. The Court issues this opinion to provide its

reasons for granting Petitioner's requests.[1]

## BACKGROUND

Petitioner is a 39-year-old husband to a United States citizen, with whom he has two

young children. Petitioner first arrived in the United States in January 2000 without valid entry

---

[1] Following the Court's ruling on June 20, 2018, Petitioner filed an amended petition on
July 6, 2018. *See* ECF No. 27. That petition was not before this Court, and, therefore, this
opinion analyzes only the habeas petition at ECF No. 5.

documents. First Am. Pet. ¶ 15; Syed Decl. ¶ 5, ECF No. 15. He was paroled into the United

States, detained, and issued a notice to appear before an immigration judge. First Am. Pet. ¶ 15;

*id.*, Ex. O; Syed Decl. ¶ 6.[2] On April 7, 2000, Petitioner was released from detention on a

$3,000 bond. Syed Decl. ¶ 7. On December 13, 2000, an immigration judge ordered him

removed to China. First Am. Pet. ¶ 16; Syed Decl. ¶ 8. Petitioner appealed, but, on November

12, 2002, the Board of Immigration Appeals ("BIA") affirmed the immigration judge's decision.

First Am. Pet. ¶ 16; Syed Decl. ¶ 8. Nevertheless, U.S. Immigration and Customs Enforcement

("ICE") did not execute the removal order.

In 2008, Petitioner filed a motion to reopen his removal proceedings, which the BIA

denied as untimely. Syed Decl. ¶ 9. In 2010, the BIA denied a second motion to reopen as

untimely and number-barred. *Id.* In 2016, the BIA denied a third motion to reopen. *Id.*

While his struggles with the immigration system were ongoing, Petitioner began a family

in the United States. In 2007, Petitioner married Yumei Chen in a traditional Chinese ceremony.

First Am. Pet. ¶ 17. In 2012, the couple had their first child, a daughter. *Id.* ¶ 18. In 2013, the

couple legally registered their marriage in New York City. *Id.* ¶ 17. At that time, Petitioner's

wife was a legal permanent resident. *Id.* In 2014, the couple had a second child, a son. *Id.* ¶ 18.

In 2015, Petitioner's wife became a U.S. citizen and filed an I-130 petition to classify

Petitioner as her immediate relative. *Id.* ¶ 20. Petitioner filed an I-485 application for an

adjustment of status to legal permanent resident. *Id.* Petitioner received a notice scheduling his

---

[2] Aliens arriving at the border are considered "applicants for admission" into the country. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 197 (2d Cir. 2011). An arriving alien may be admitted, deemed inadmissible, or, even if he might otherwise be inadmissible, "may be granted 'parole into the United States' for humanitarian or public benefit purposes." *Id.* at 198. Here, it is undisputed that Petitioner was paroled into the United States in 2000. *See* First Am. Pet. ¶ 15; *id.*, Ex. O.

I-485 interview—colloquially, a "green card" interview—for May 23, 2018. First Am. Pet., Ex. N.

On May 23, 2018, Petitioner and his wife appeared at the U.S. Citizenship and Immigration Services ("USCIS") offices for the I-485 interview. First Am. Pet. ¶ 24. At the interview, the couple was questioned about their relationship. *Id.* ¶ 25. But, before being questioned on his I-485 petition, ICE officers arrested Petitioner pursuant to the 2002 order of removal. *Id.* Petitioner remained in the custody of ICE, which, prior to this Court's order releasing Petitioner, intended to deport him no later than July 1, 2018. Syed Decl. ¶ 13.

Later on the same day, USCIS granted the I-130 petition, First Am. Pet., Ex. L, but denied Petitioner's I-485 application, First Am. Pet., Ex. O. USCIS found that Petitioner was eligible for an adjustment of status, but concluded that his entry into the United States without documentation, failure to depart the country, unlawful presence, and employment were adverse factors that counseled against an exercise of discretion in favor of adjustment of status. *Id.* at 2.

Petitioner has since filed a motion to reopen the adjustment of status decision, filed for a stay of removal with the BIA, and filed a fourth motion to reopen his removal proceedings with the BIA. First Am. Pet. ¶¶ 33, 40. Additionally, on June 14, 2018, Petitioner filed the instant habeas petition arguing that his arrest and detention violated the Immigration and Nationality Act ("INA") and related regulations, the Due Process Clause of the Constitution, and the Administrative Procedure Act ("APA"). *See generally id.*

Specifically, Petitioner argues that, under the INA and the Constitution, he should have been afforded notice, an opportunity to be heard, and a determination that he was either dangerous or a flight risk before being arrested and detained on May 23, 2018. *Id.* ¶¶ 44–5, 47– 48. He additionally argues that his arrest and detention at his green card interview violate both

the INA's statutory scheme permitting aliens like Petitioner to seek adjustment of status and his due process right to seek relief via adjustment of status. *Id.* ¶¶ 51–52, 54–55. Finally, Petitioner argues that USCIS committed legal error by considering irrelevant factors when the agency denied his adjustment of status application. *Id.* ¶ 51.

On June 16, 2018, Petitioner moved by order to show cause for a temporary stay of removal. The Court denied his motion, on jurisdictional grounds. ECF No. 10. Petitioner filed a motion for reconsideration, which the Court granted. ECF No. 11. The Government filed its opposition to the stay on June 19, 2018, Resps. Opp., ECF No. 14, and Petitioner filed his reply the next day, June 20, 2018, and requested release from custody, Pet. Reply. Following a show cause hearing, the Court granted Petitioner's requests for a stay of removal and release from custody pending the resolution of his habeas petition. The discussion that follows details the Court's reasoning for granting Petitioner's requests.

## DISCUSSION

### I. Jurisdiction

As a threshold matter, Respondents[3] argue that the Court lacks jurisdiction to grant Petitioner's requested relief. First, Respondents argue that the Court lacks subject matter jurisdiction because 8 U.S.C. § 1252(g) bars the Court from adjudicating any legal challenge that "aris[es] from the decision or action by the Attorney General to . . . execute removal orders against" Petitioner.[4] 8 U.S.C. § 1252(g); *see also* Resps. Opp. at 5–6. Second, Respondents

---

[3] In this opinion, the term "Respondents" refers to the federal government officials sued in their official capacities in this action. Petitioner has indicated that he intends to move the Court to strike the local government officials as respondents. Pet. Reply, at 15 n.2.

[4] The INA refers to the Attorney General as the official to whom Congress delegates its authority, but, following the creation of the Department of Homeland Security, this authority over immigration matters belongs to the Secretary of Homeland Security. *See Clark v. Martinez,*

argue that 8 U.S.C. §§ 1252(a)(5) and (b)(9) channel judicial review to the federal appellate courts via petitions for review. Resps. Opp. at 6–7. Finally, Respondents argue that § 1252(a)(2)(B) precludes district courts from reviewing a denial of adjustment of status. *Id.* at 10. Respondents' arguments are unavailing.

### A. § 1252(g)

Under 8 U.S.C. § 1252(g), "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien." Respondents argue that the Supreme Court's interpretation of this provision "alone" bars judicial review, *id.* at 7, but Respondents mischaracterize the Supreme Court's decision in *Reno v. Am.- Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) (hereinafter "*AADC*").

In *AADC*, the Supreme Court rejected the contention that § 1252(g) "is a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'" *AADC*, 525 U.S. at 482. As the Supreme Court explained, "[i]n fact, what § 1252(g) says is much narrower. The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *Id*. (quoting § 1252(g)).

The *AADC* Court reasoned that it was appropriate to limit judicial review to these "three discrete actions" in light of legislative history. In the past, as now, the Secretary enjoyed prosecutorial discretion to decline to commence proceedings, adjudicate cases, or execute removal orders. The Secretary's decision not to prosecute certain cases had prompted litigation

---

543 U.S. 371, 374 (2005) (citing 6 U.S.C. §§ 251(2), 252(a)(3), 271(b)). Unless quoting the statute or precedent, the Court refers to the "Secretary of Homeland Security" or the "Secretary" as the proper official.

in other cases attempting to compel the Secretary to use her discretion not to prosecute.

Essentially, "[s]ince no generous act goes unpunished, . . . the . . . exercise of this discretion

opened the door to litigation in instances where the [Secretary] chose *not* to exercise it." *Id.* at

484. Specifically,

> [e]fforts to challenge the refusal to exercise such discretion on behalf of specific
> aliens sometimes [were] favorably considered by the courts, upon contentions that
> there was selective prosecution in violation of equal protection or due process,
> such as improper reliance on political considerations, on racial, religious, or
> nationality discriminations, on arbitrary or unconstitutional criteria, or on other
> grounds constituting abuse of discretion.

*Id.* at 484–85 (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, *Immigration Law and*

*Procedure* § 72.03[2][a] (1998)). It was this reason, the *AADC* Court explained, that motivated

Congress to limit judicial review of these particular, discrete acts.

Under *AADC*, therefore, § 1252(g) prohibits judicial review of challenges to the

discretionary decision whether to execute a removal order. But here, the habeas petition does not

challenge the discrete decision to remove Petitioner. The question before the Court is not why

the Secretary chose to execute the removal order. Rather, the question is whether the way

Respondents acted accords with the Constitution and the laws of this country. Whether

Respondents' actions were legal is not a question of discretion, and, therefore, falls outside the

ambit of § 1252(g).

Put another way: Respondents are empowered to remove Petitioner at their discretion.

But they cannot do so in any manner they please. Respondents could not, for example, execute

removal by dropping Petitioner on a life raft in the middle of the Atlantic Ocean. Nor, to use a

less far-fetched example, could they indefinitely detain Petitioner, even for the purposes of

executing a final order of removal. *Zadvydas v. Davis*, 533 U.S. 678 (2001). That courts can

review "how" Respondents exercise their discretion is, therefore, an uncontroversial proposition.

*See, e.g.*, *Pensamiento v. McDonald*, No. 18 Civ. 10475, 2018 WL 2305667, at *2 (D. Mass. May 21, 2018) (concluding that §§ 1252(a)(5), (b)(9), and (g) do not bar district courts from "review[ing] habeas challenges to unlawful immigration detention"); *Nak Kim Chhoeun v. Marin*, No. 17 Civ. 1898, 2018 WL 1941756, at *4 (C.D. Cal. Mar. 26, 2018) (concluding that §§ 1252(a)(5), (b)(9), and (g) "restrict[] district court review over claims contesting the merits or validity of a removal order," but not "the manner in which [petitioners] were re-detained" after being released); *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (concluding that § 1252(g) did not bar petitioner's challenge to his detention because detention "is independent from the decision or action to commence a removal proceeding").

Respondents attempt to forestall this conclusion by emphasizing that § 1252(g) prohibits judicial review of any claims "arising from" the decision to execute an order of removal. Resps. Opp. at 7. But as recently as this year, the Supreme Court has reiterated that, "when confronted with capacious phrases like 'arising from,' we . . . eschew[] 'uncritical literalism' leading to results that 'no sensible person could have intended.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016)). Referencing § 1252(g) as an example, the Supreme Court explained that it "did not interpret [§ 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves." *Id.* at 841.

As the Supreme Court originally reasoned in *AADC*, this narrow reading is appropriate given that § 1252(g) "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. The majority in *AADC* was unperturbed by the dissent's protest that its narrow reading parsed the statute "too finely."

7

*Id.*  Even "if it did," the majority concluded, "we would think that modest fault preferable to the exercise of such a novel power of nullification."  *Id.*  Applied to the instant case, therefore, § 1252(g) is no bar to jurisdiction.

**B.  §§ 1252(a)(5) and (b)(9)**

Respondents' arguments that §§ 1252(a)(5) and (b)(9) strip jurisdiction also fail.  Under 8 U.S.C. § 1252(a)(5), "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal."  Under § 1252(b)(9), "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order."

Respondents argue that, taken together, these provisions strip district courts of jurisdiction over any claims "arising from" orders of removal, including jurisdiction over stays of removal.  Resps. Opp. at 8–10.  Respondents urge that only the courts of appeals may review such claims.  *Id.*  However, the cases that Respondents rely upon to support their argument fail to address the Supreme Court's more recent plurality opinion in *Jennings*.[5]  In *Jennings*, as discussed above, the Supreme Court disavowed judicial overreliance on "capacious phrases like 'arising from.'"  *Jennings*, 138 S. Ct. at 840.  More importantly, the Supreme Court held that this

---

[5] The only binding authority Respondents cite, albeit without discussion, are *Singh v. USCIS*, 878 F.3d 441 (2d Cir. 2017), *as amended* (Jan. 9, 2018), and *Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011).  Even if the reasoning of those cases were to apply here, the Court is not persuaded by Respondents' citations to *Singh* and *Delgado*.  Neither the *Singh* nor the *Delgado* court had the benefit of the Supreme Court's opinion in *Jennings*.  As discussed *infra*, *Jennings* rejects broad readings of the INA's jurisdiction-stripping provisions.  *Jennings*, 138 S. Ct. at 840.

"capacious" language in § 1252(b)(9) does not deprive courts, including the Supreme Court, of jurisdiction to hear every possible question of law that arise from an order of removal. *Id.*

The *Jennings* Court considered several hypothetical claims a petitioner could make, such as "inhumane conditions of confinement" under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), "state-law claim[s] for assault against a guard or fellow detainee," or tort claims against a truck driver who crashes into an ICE transport bus. *Id.* The Court reasoned that such claims would "arise from actions taken to remove the aliens," but concluded that "cramming judicial review of [such claims] into the review of final removal orders would be absurd." *Id.* (internal alterations and quotation marks omitted).

The Supreme Court was especially concerned with the risk that

[i]nterpreting "arising from" in this extreme way would also make claims of prolonged detention effectively unreviewable. By the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place. And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.

*Id.* Similarly, here, interpreting §§ 1252(a)(5) and (b)(9) to bar Petitioner's claims challenging his arrest and detention unless those claims were "cramm[ed]" into a petition for review of a removal order would render such claims "effectively unreviewable." *Id.* Petitioner's right to file a petition for review of his 2002 order of removal has long since expired. Respondents' reading of §§ 1252(a)(5) and (b)(9) would therefore permit ICE to arrest, detain, and remove Petitioner without any statutory or constitutional constraints. Indeed, Petitioner would not only be barred from bringing claims against ICE. While in ICE custody, he would also be barred from suing any official or private person for tortious conduct. This is the precise result the Supreme Court sought to avoid in *Jennings*.

To the extent that the "arising from" language renders § 1252 ambiguous, which this

Court doubts in light of *Jennings*, the statute's legislative history demonstrates that Congress

intended § 1252(b)(9) to "not preclude habeas review over challenges to detention that are

independent of challenges to removal orders." H.R. Conf. Rep. 109-72, 175 (2005), *reprinted in*

2005 U.S.C.C.A.N. 240, 300. There is, therefore, no reason to bar Petitioner's challenge here.

**C. § 1252(a)(2)(B)**

Finally, the Court rejects Respondents' § 1252(a)(2)(B) argument. Under

§ 1252(a)(2)(B), "no court shall have jurisdiction to review . . . . any judgment regarding the

granting of" an adjustment of status application brought under § 1255. *See* 8 U.S.C.

§ 1252(a)(2)(B). As Respondents appear to recognize, however, (a)(2)(B) "does not strip courts

of jurisdiction to review nondiscretionary decisions regarding an alien's eligibility for the relief"

under § 1255. *Sepulveda v. Gonzales*, 407 F.3d 59, 62–63 (2d Cir. 2005).

Still, Respondents maintain that, as this Court found in *Mahmood*, the Court "could not

stay removal where USCIS reached a decision by balancing adverse factors against favorable

factors, even if the Court disagreed with USCIS's conclusion." Resps. Opp. at 10 (quoting

*Mahmood v. Nielsen*, No. 17 Civ. 8233, 2018 WL 2148439, at *3 (S.D.N.Y. May 9, 2018)).

Here, Respondents argue, "USCIS reached its decision denying Petitioner's Form I-485 based on

such a balancing analysis." *Id.* Respondents maintain that this analysis is discretionary, and,

therefore, squarely barred by § 1252(a)(2)(B). Although the Court agrees that its judicial review

is limited to nondiscretionary decisions under § 1252(a)(2)(B), the Court concludes that (a)(2)(B)

does not bar review in this case.

"[C]ourts lack jurisdiction to review USCIS's 'factfinding, factor-balancing, and

exercise of discretion' under § 1252(a)(2)(B), but retain jurisdiction 'to review nondiscretionary

decisions regarding an alien's eligibility for . . . relief." *Sandhu v. United States*, 916 F. Supp. 2d 329, 333 (E.D.N.Y. 2013) (quoting *Rosario v. Holder*, 627 F.3d 58, 61 (2d Cir. 2010) and *Sepulveda*, 407 F.3d at 62–63). "[G]iven the limitation on [courts'] jurisdiction, the only relevant inquiry is whether the agency applied the correct legal standard and considered the appropriate factors." *Adebola v. Sessions*, 723 F. App'x 41, 44 (2d Cir. 2018) (summ. order) (citing 8 U.S.C. §§ 1252(a)(2)(B)(i), (D)). The Court, therefore, retains jurisdiction over Petitioner's claim for the limited purpose of conducting this "relevant inquiry." *Id.*

Accordingly, the Court rejects all of Respondents' jurisdictional arguments. As such, the Court finds no need to reach Petitioner's argument that Respondents' reading of § 1252 would violate the Suspension Clause if applied to bar Petitioner's claims. Pet. Reply, at 8–9. The Supreme Court has already provided all the guidance necessary to interpret (a)(5), (b)(9), and (g). That is, properly interpreted, § 1252 does not strip district courts of jurisdiction to hear habeas claims that are independent from judicial review of a final order of removal. And the Second Circuit has explained that § 1252(a)(2)(B) does not eliminate review of legal errors in the denial of an application for adjustment of status. Accordingly, the Court has jurisdiction to review Petitioner's claims.

## II.     Venue

One threshold issue remains. Respondents argue that venue is not proper in the Southern District of New York because Petitioner is being held at the Bergen County Jail, in Hackensack, New Jersey. Specifically, Respondents argue that, under the "immediate custodian rule" articulated in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), habeas challenges to detention must be brought against "the warden of the facility where the prisoner is being held," in only "the district of confinement." Resps. Opp. at 16 (quoting *Cesar v. Shanahan*, No. 17 Civ. 7974, 2018 WL

1747989, at *1 (S.D.N.Y. Feb. 5, 2018)).  As this Court has recently concluded, the immediate custodian rule is a rule of venue.  *Mahmood*, 2018 WL 2148439, at *4.

Respondents note, correctly, that several courts within this Circuit have applied the immediate custodian rule to bar aliens detained in New Jersey from bringing habeas petitions in this district.  Resps. Opp. at 16–17 (collecting cases).  Petitioner responds that "the vast majority of the cases cited by Respondents contain only a cursory analysis of the venue issue," but that, upon careful review, *Padilla* actually "*supports* the Petitioner's view that venue is proper in this district."  Pet. Reply, at 16.

Petitioner argues that the *Padilla* Court was predominantly concerned with an alien exploiting the fact that there exist officials with "remote supervisory authority," like the Secretary of Defense, who may be sued in any district.  *Id.* at 16–17.  That concern, Petitioner argues, is not relevant here.  What is relevant is that Bergen County Jail is not an ICE facility, but, rather, an ordinary jail that "rents bed space to ICE."  *Id.* at 17.  The only immediate custodians with legal control over Petitioner are ICE officials located in this district, and, therefore, Petitioner argues, venue is proper here.  *Id.*

As an initial matter, it is an open question whether *Padilla* applies to this case.  Because *Padilla* arose in the criminal context, the Supreme Court explicitly declined to address the application of the immediate custodian rule to alien detainees.  *Padilla*, 542 U.S. at 435 n.8.  Assuming it applies, however, the Court concludes that venue is still appropriate in the Southern District of New York given that, in this case, Petitioner's immediate custodian is not the warden of the Bergen County Jail but, in fact, ICE officials located in this district.

In *Padilla* and *Rasul v. Bush*, 542 U.S. 466, 478 (2004), decided on the same day, the Supreme Court reaffirmed its holding in *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S.

484 (1973). In *Braden*, the Supreme Court upheld an Alabama prisoner's habeas petition brought in Kentucky based on a Kentucky "confinement that would be imposed in the future." *Padilla*, 542 U.S. at 438. The *Braden* decision relied on the understanding that "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody." *Rasul*, 542 U.S. 466 at 478 (quoting *Braden*, 410 U.S. at 494–95). As such, the petitioner could bring a habeas petition against "the entity or person who exercise[d] legal control with respect to the challenged 'custody'" even if that person was located in a different district than the district of current confinement. *Padilla*, 542 U.S. at 438. In *Padilla*, however, the Supreme Court explained that "nothing in *Braden* supports departing from the immediate custodian rule in the traditional context of challenges to present physical confinement." *Id.*

Here, although Petitioner is challenging "present physical confinement," the facts of this case are unlike "the traditional context of challenges to present physical confinement." *Id.* The Court concludes that, in this context, predicating venue on the location of Petitioner's ICE custodians is more faithful to the Supreme Court's dictates in *Padilla* than predicating it on the location of a non-ICE contractor who has no "legal control" over Petitioner. *Padilla*, 542 U.S. at 438. Accordingly, venue is proper in this district.

## III.     Merits

The parties did not brief what standard applies to requests for a temporary stay of removal and release from custody. The Court, therefore, applies the "traditional" test for stays in cases involving the government, *see Nken v. Holder*, 556 U.S. 418, 426 & 435 (2009), which is substantially similar to the standard for injunctive relief that would apply for release from custody, *see Mahmood*, 2018 WL 2148439 (ordering release upon a showing of a likelihood of

success on the merits and irreparable harm).  Accordingly, the Court evaluates both requests for relief together under the same test.

Under this test, "[c]ourts must consider: (1) whether the applicant has shown a likelihood of success on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Kabenga v. Holder*, 76 F. Supp. 3d 480, 482 (S.D.N.Y. 2015).  "Of these factors, the first two are the most critical." *Id.* (internal quotation marks omitted).  And the final two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

### A.  Likelihood of Success on the Merits

#### a.  INA Claims

Petitioner makes three INA arguments.  He argues that Respondents (1) were required to provide him with procedural protections, (2) violated the INA when they used the adjustment of status process to arrest and detain Petitioner, and (3) committed legal error when denying Petitioner's application for adjustment of status.

##### i.  Procedures

Petitioner first argues that, "[i]interpreted in light of the Constitution," his detention without notice, opportunity to be heard, or individualized determination as to whether he poses a danger or flight risk violates the INA and applicable regulations.  First Am. Pet. ¶¶ 44–45.  Specifically, Petitioner argues that the INA mandates detention only during a 90-day "removal period" that begins when an order of removal becomes final.  *Id.*  Because Petitioner's "removal period" expired some sixteen years ago, he argues that he has a right to more process under the

14

INA. *Id.* Upon careful consideration, the Court concludes that Petitioner has demonstrated a likelihood of success on this claim.

By its terms, the INA first directs that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period')." 8 U.S.C. § 1231(a)(1)(A). Section 1231(a)(6) of the INA then provides that an alien "may be detained beyond the removal period" if the alien "has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal" or in certain circumstances that are not relevant here.[6] *Id.* § 1231(a)(6). Otherwise, "[i]f the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3).

In other words, the INA lays out only two possibilities after the 90-day removal period expires for a case like Petitioner's. Under § 1231, either (1) the alien remains in detention upon a finding that he or she is dangerous or a flight risk, or (2) he or she is subject to "supervision," which essentially permits the alien to be released on certain conditions.[7] As such, the plain text of the statute does not provide ICE with the authority to detain Petitioner without a finding that his release posed a risk of danger or flight.

_____

[6] Section 1231(a)(6) permits detention beyond the removal period in only two other circumstances: when an alien ordered removed (1) is inadmissible, or (2) is removable on the basis of certain immigration violations, crimes, or public security reasons. 8 U.S.C. § 1231(a)(6). Because Petitioner was paroled into the United States and is not removable on any of the foregoing grounds, these circumstances are not relevant to his detention claims.

[7] Indeed, in *Zadvydas*, the Supreme Court recognized that § 1231 provides a "choice . . . not between imprisonment and the alien 'living at large,'" but "between imprisonment and supervision under release conditions that may not be violated." *Zadvydas*, 533 U.S. at 696.

Respondents counter that the INA's applicable regulations at 8 C.F.R. §§ 241.4 and 241.13 empower them to revoke Petitioner's 2002 release without making the necessary findings. *See* 8 C.F.R. § 241.4(*l*)(2); *id.* § 241.13(i)(2). But §§ 241.4 and 241.13 only apply to aliens who were initially detained or released following a final order of removal pursuant to the custody review procedures at § 241.4. *See id.* § 241.4(a) (explaining that ICE authorities "may continue an alien in custody beyond the removal period . . . pursuant to the procedures described in this section"); *see also id.* § 241.13(a) ("This section establishes special review procedures for those aliens who are subject to a final order of removal and are detained under the custody review procedures provided at § 241.4 after the expiration of the removal period."). In other words, Respondents may only revoke a release pursuant to §§ 241.4 and 241.13 if they had originally granted that release pursuant to § 241.4.

Here, in 2003, it is undisputed that Petitioner was neither detained nor released pursuant to § 241.4 following his final order of removal. Indeed, he was released in 2000 before his removal order became final. *See* Syed Decl. ¶¶ 7–8. His release, therefore, could not have been pursuant to § 241.4, which only applies to detention and release after a final order of removal. Because his release was not pursuant to § 241.4, Respondents cannot revoke his release under §§ 241.4. and 241.13.

Even assuming *arguendo* that Respondents had the authority to revoke Petitioner's release under § 241.4 in May 2018, they could not detain him without providing him with notice and an informal interview. *See generally* 8 C.F.R. § 241.4(*l*). Nor could they detain Petitioner without finding that he was "a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). Detention to facilitate removal—even imminent removal—is not permitted beyond the removal period for an alien like Petitioner except upon such findings.

*Id.* Regulations cannot circumvent the plain text of the statute. *Cf. Succar v. Ashcroft*, 394 F.3d 8, 10 (1st Cir. 2005) (overturning a regulation as "inconsistent" with "the language and structure" of the INA).

To the extent that there is any ambiguity in the statute, the Court's conclusion that Respondents must make the proper findings is "buttressed by 'the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien,'" *I.N.S. v. St. Cyr*, 533 U.S. 289, 320 (2001) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987)), as well as regulatory history. When it adopted § 241, the Department of Justice explained that it construed the INA "to authorize [the government] to continue to detain, beyond the 90-day removal period, criminal aliens and other aliens whose release would present a risk of harm to the community or of flight by the alien." Detention of Aliens Ordered Removed, 65 Fed. Reg. 80281-01, 2000 WL 1860526 (Dec. 21, 2000). Because Petitioner has no criminal convictions, he could only be detained in 2018 as an "alien[] whose release would present a risk of harm to the community or of flight by the alien." *Id.* But no hearing was held to determine the risks of Petitioner's release. Nor would a hearing be likely to find any risk, given Petitioner's strong family ties, relationship with the community, and lack of criminal record.

Contrary to Respondents' arguments, therefore, Petitioner's detention was not "consistent with the INA and applicable regulations." Resps. Opp. at 13. Accordingly, Petitioner is likely to succeed on his claim that Respondents had no authority to detain him.

### ii. Arrest and Detention

Petitioner's second statutory claim is that he followed all the "regulations and government policies to legalize his status" by applying for adjustment of status, and, therefore, that his arrest and his subsequent detention "in the middle of this process" violate the INA and

applicable regulations. First Am. Pet. ¶ 52. The Court concludes that Petitioner has also demonstrated a likelihood of success on this claim.

The Court begins with the text. Under the INA, at 8 U.S.C. § 1255, Congress provides pathways to legal residency for certain classes of aliens. These pathways permit aliens not lawfully in the United States to "adjust" their status to legal permanent resident if they meet certain requirements. As an initial matter, for an alien to apply for adjustment of status, he or she must have been "admitted or paroled into the United States." 8 U.S.C. § 1255(a). If so admitted or paroled, the Secretary "may" adjust the alien's status to that of a permanent resident "if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." *Id.*

Several other restrictions apply, however. Aliens convicted of certain crimes are generally ineligible to apply for adjustment of status because they are deemed inadmissible, *see* 8 U.S.C. § 1182(a)(2), and, therefore, not "admitted or paroled into the United States" unless the Secretary can and does waive inadmissibility. Additionally, as relevant here, aliens who work without authorization or who are in unlawful immigration status cannot apply for adjustment of status, unless they are immediate relatives, such as spouses, of citizens. 8 U.S.C. §§ 1255(c), (k). Nor is an alien who voluntarily departs or is removed eligible to apply for adjustment of status within 10 years of the date of the departure or removal. 8 U.S.C. § 1182(a)(9)(A)(ii)(I).

Here, Petitioner is not barred by the INA's many restrictions. He was paroled into the country in 2000 and has no criminal record. First Am. Pet. ¶ 15. He is married to a United States citizen—a marriage Respondents have recognized as bona fide—and he has two citizen children. *Id.* ¶¶ 17–18, 28. Petitioner is, in short, the exact type of applicant that Congress

intended to benefit when it adopted and, over many years, repeatedly amended, the complicated statutory scheme governing the adjustment of status process. Respondents' actions frustrate that scheme.

As the Supreme Court has explained, "[s]tatutory construction is a holistic endeavor." *Smith v. United States*, 508 U.S. 223, 233 (1993) (internal alterations omitted) (quoting *United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)). "Just as a single word cannot be read in isolation, nor can a single provision of a statute." *Id.* Rather, "in expounding a statute, [courts] [are] not . . . guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)).

Here, read as a whole, the INA creates "a regulatory interstice." *Ceta v. Mukasey*, 535 F.3d 639, 646 (7th Cir. 2008). "Section 1255 and the amended regulation, 8 C.F.R. § 245.2(a)(1), afford [Petitioner] an opportunity to seek adjustment of status with the USCIS," but, at the same time, he risks removal before being able to complete the adjustment of status process. *Id.* Without court intervention, therefore, such as via a stay of removal, "the statutory opportunity to seek adjustment of status will prove to be a mere illusion." *Id.* at 647; *see also Kalilu v. Mukasey*, 516 F.3d 777 (9th Cir. 2008) (explaining that the BIA's denial of a motion to reopen "rendered worthless" an alien's ability to seek adjustment of status); *Sheng Gao Ni v. Bd. of Immigration Appeals*, 520 F.3d 125, 131 (2d Cir. 2008) (discussing *Kalilu*). The Court declines to read the INA in a way that nullifies its adjustment of status scheme.

The Court's interpretation is consistent with Congress's intent in drafting the INA and adopting this specific scheme. As the Second Circuit has explained, the INA's "prevailing

purpose" is to "implement[] the underlying intention of our immigration laws regarding the preservation of the family unit." *Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (quoting H.R. Rep. No. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680); *cf. I.N.S. v. Errico*, 385 U.S. 214, 220 (1966) (interpreting several 1957 amendments to the INA that created exceptions for immediate relatives of citizens as "plainly" evidencing an "intent . . . [to] keep[] family units together.  Congress felt that, in many circumstances, it was more important to unite families and preserve family ties than it was to enforce strictly the quota limitations or even the many restrictive sections that are designed to keep undesirable or harmful aliens out of the country.").

The INA's adjustment of status scheme is perhaps one of the statute's strongest articulations of Congress's considered public policy in favor of family unity and association.  And as such, "[t]he immigration laws about adjustment of status are not a haphazard compilation of provisions; they are a calibrated set of rules that govern an area of national importance." *Succar*, 394 F.3d at 26.  "The statutory scheme reflects Congress's careful balancing of the country's security needs against the national interests Congress wished to advance through adjustment of status proceedings." *Id.* at 10.  Those "national interests" include the preservation of the family.  *Id.* at 22 ("[I]n enacting section 1255(a) in 1960, Congress expressed an intent that eligible aliens be able to adjust status without having to leave the United States, to relieve the burden on the United States citizen with whom the aliens had the requisite family or other relationship."); *see also Matter of Ibrahim*, 18 I. & N. Dec. 55, 57–58 (BIA 1981) ("The Immigration and Nationality Act makes immediate relative status a special and weighty equity.").

Despite this carefully balanced adjustment of status scheme, Respondents argue that they have authority under § 1231(a)(6) to detain Petitioner beyond the removal period. Setting aside that § 1231(a)(6) only permits Respondents to detain Petitioner if he is determined to be a danger or flight risk, the plain text of § 1231 does not address how Respondents' authority to detain interacts with an alien's opportunity to adjust his or her status. Nor do Respondents address the relationship between the INA's adjustment of status provisions and § 1231. Instead, Respondents counter that Petitioner has not "shown that he cannot seek adjustment of status, or appeal administratively or judicially if adjustment is denied, after his removal." Resps. Opp. at 14. They also argue that Petitioner has not shown that he is "entitle[d] . . . to delay his removal pending administrative review of USCIS's denial of adjustment of status." *Id.*

However, if Petitioner is removed, any application for adjustment of status would be deemed abandoned, 8 C.F.R. § 245.2(a)(4)(ii)(A), and Petitioner could not re-apply for ten years, 8 U.S.C. § 1182(a)(9)(A)(ii). Absent a stay of removal, therefore, Respondents would have thwarted Petitioner's efforts to adjust his status for at least a decade and separated him from his wife and children, who are U.S. citizens. Additionally, Respondents' arguments fail to give due consideration to the INA's comprehensive statutory scheme for adjustment of status. The central question is: Did Respondents violate that statutory scheme when they invited Petitioner to an I-485 interview for a green card, but then, rather than interview him, arrested and detained him? Placed in proper statutory context, as explained above, the answer to this question is yes.

By inviting Petitioner to interview for his green card and arresting him at his interview appointment, Respondents deployed § 1255 to effectuate the opposite of its intended outcome for aliens like Petitioner. Respondents used the adjustment of status scheme as a sword when it was

intended to be used as a shield. As such, Respondents' arrest and detention of Petitioner "upset[] the balance Congress created." *Succar*, 394 F.3d at 10.

The Court rejects arrest and detention practices predicated on manipulating the laws that Congress has passed. Congress did not intend its carefully considered adjustment of status process for a select group of aliens to become a mechanism for "gotcha" law enforcement. Nor could it, without raising serious constitutional concerns. These type of bait-and-switch tactics are not only a perversion of the statute, but also likely offensive to "the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 169 (1952) (internal quotation marks omitted).[8]

Because courts "must assume that when drafting the INA, Congress did not intend an absurd or manifestly unjust result," *Lockhart v. Napolitano*, 573 F.3d 251, 260 (6th Cir. 2009), the Court concludes that Congress could not have intended its silence on the interplay between adjustment and removal to permit ICE to exploit the former in service of the latter. Accordingly, Petitioner has demonstrated that his arrest at USCIS's offices and his detention pursuant to that arrest likely violated the INA.

### iii. Legal Error

Finally, Petitioner argues that he was refused an I-485 interview and "that USCIS conflated eligibility and discretion" by considering positive or irrelevant factors to be adverse

---

[8] Indeed, Respondents' actions in this case appear to bear on substantive and procedural due process interests in freedom from restraint, *see Zadvydas*, 533 U.S. at 690 ("[F]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."), substantive due process interests in family preservation, *see Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) ("Parents have a substantive right under the Due Process Clause to remain together with their children without the coercive interference of the awesome power of the state.") (internal alterations and quotation marks omitted)), and the First Amendment right to petition the government, *see* Michael J. Wishnie, *Immigrants and the Right to Petition,* 78 N.Y.U. L. Rev. 667 (2003).

factors when adjudicating his § 1255 adjustment of status application.  Pet. Reply, at 12.

Essentially, Petitioner argues that USCIS misapplied the law, and, therefore, "unlike an agency's

unwise exercise of given discretion," USCIS's denial of Petitioner's application is subject to

judicial review and should be reversed.  *Id.*  Petitioner has shown a likelihood of success on the

merits of this claim.

As an initial matter, the implementing regulations for adjustment of status under § 1255

state that "[e]ach applicant for adjustment of status under this part *shall* be interviewed by an

immigration officer."  8 C.F.R. § 245.6 (emphasis added).  Although the interview may be

waived when "it is determined by [USCIS] that an interview is unnecessary," there is no

indication that USCIS made such a determination.  Indeed, the fact that USCIS invited Petitioner

to its offices for an interview suggests that the agency determined the opposite.  As such, the

denial of an interview would appear to be a violation of the INA's implementing regulations.

Even if Petitioner had been given an interview, USCIS, he argues, committed legal error

when adjudicating his adjustment application.  Respondents do not contest the merits of

Petitioner's claim.  Resps. Opp. at 10.  Respondents argue only that, as discussed in Part I, the

Court does not have jurisdiction to review USCIS's decision because review of the agency's

balance of favorable and adverse factors is barred by § 1252(a)(2)(B).  *Id.*  As the Court has

explained, it agrees that it cannot review USCIS's "factor-balancing."  *Rosario*, 627 F.3d at 61.

But it retains jurisdiction to determine whether USCIS committed legal error.  *Adebola*, 723 F.

App'x at 44.

Here, USCIS labeled several factors as "adverse" in contravention of the statutory

scheme that Congress created for alien relatives of U.S. citizens.  *See* Ex. O. at 2.  The agency

considered the facts that Petitioner entered the country "without any documentation," worked

"without authorization,"[9] was denied asylum, and was unlawfully present after his removal order became final to be "adverse" factors. *Id.* But these facts, where applicable, bear on an alien's eligibility for adjustment of status. 8 U.S.C. § 1255(c). As a result, they do not appear to be proper factors at the discretionary stage, especially where Congress specifically created an exception to these bars to eligibility for immediate relatives of citizens. *Id.*

Labeling these facts as "adverse" would not only collapse the eligibility and discretionary stages of the adjustment of status process, but also render the reasons an alien must seek relief the same reasons he is barred from relief. Surely, Congress did not intend these results. Instead, as the Court explained above, Congress intended to facilitate family unity for a case like Petitioner's. *Succar*, 394 F.3d at 10. USCIS's mislabeling of eligibility factors as "adverse" factors at the discretionary stage are inconsistent with the text, structure, and history of the INA's statutory scheme for adjustment of status.

In concluding that USCIS committed legal error, the Court does not substitute its judgment for that of the agency. The agency has discretion to determine what weight to assign each factor and how to balance favorable factors against adverse ones. But the agency cannot label as "adverse" whatever facts it pleases. *Cf. Jen Hung Ng v. I.N.S.*, 804 F.2d 534, 540 (9th Cir. 1986) ("The inclusion of an improper factor in reaching a discretionary decision is grounds for remand."). And Respondents do not argue otherwise, seemingly conceding that USCIS confused the proper factors. Accordingly, Petitioner has demonstrated a likelihood of success on this claim.

---

[9] The agency considered Petitioner's employment to be both a favorable and adverse factor, but "a history of employment" and "the existence of property or business ties" have long been ruled to be favorable factors in similar adjustment of status contexts. *Matter of Marin*, 16 I. & N. Dec. 581, 584–85 (BIA 1978).

### b. APA Claims

Petitioner brings a final statutory claim under the APA. Petitioner argues that Respondents have violated the APA's prohibition against agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." First Am. Pet. ¶ 58 (quoting 5 U.S.C. § 706(2)(A)). Because the Court has already concluded that Respondents' actions were "not in accordance with law," the Court likewise concludes that Petitioner has demonstrated a likelihood of success on his APA claim.

### c. Constitutional Claims

Because Petitioner has demonstrated a likelihood of success on the merits of his statutory claims, the Court need not reach Petitioner's constitutional claims and declines to do so. *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149–50 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions.").

## B. Remaining Factors

### a. Irreparable Injury

The parties do not explicitly brief whether the denial of a stay of removal and release would result in irreparable injury to Petitioner or other parties interested in the proceeding. Petitioner does explain that Petitioner's detention and possible removal "have resulted in an unimaginable emotional hardship on [his] wife and children." Pet. Reply, at 6. His wife is "being treated by a psychologist as a result of the mental distress her husband's detainment and threat of deportation has had on her and the two children." *Id*. at 1. She "shows symptoms of severe depression and anxiety, [and] keeps crying in the office." *Id.* at 7.

Although, under *Nken*, 556 U.S. at 435, removal is "not categorically irreparable," the Court concludes that Petitioner has demonstrated irreparable injury in this specific case. Unlike

in cases where a removed alien may continue to pursue a petition for review from afar, *see id.*, Petitioner's removal would close his application for adjustment of status and bar him from re-applying for a decade. Additionally, removal may perpetuate grave emotional and psychological harm to his wife and children by splitting apart their family, perhaps forever. Accordingly, this factor weighs in favor of a stay of removal and release.

### b. Respondents' Injury and Public Interest

As explained above, the final two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, Respondents argue that granting Petitioner's requests "would harm the government and the public by delaying the enforcement of United States law." Resps. Opp. at 15. Respondents contend that "[t]here is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Id.* (quoting *Nken*, 556 U.S. at 436).

Petitioner argues that the "brief delay" created by a temporary stay of removal does not interfere with the public interest in enforcement of the law, especially, where, as here, Respondents have permitted Petitioner to live in this country for sixteen years without attempting to execute the removal order. Pet. Reply, at 11. Additionally, Petitioner argues that a stay of removal and release "would serve the public interest in not rushing to tear apart a young family." *Id.* at 3.

Although the Court agrees with Respondents that there is a public interest in enforcing immigration law, this interest does not necessarily weigh in Respondents' favor. The public interest is in enforcing *all* the immigration laws, including the laws governing adjustment of

status.  Here, Respondents' actions have likely violated those laws and, therefore, the public interest also lies in preventing Respondents' further abuse of the adjustment of status scheme.

Additionally, as Petitioner argues, there is a public interest in maintaining families together and, indeed, in avoiding extreme hardship to Petitioner's citizen wife and children.  The right to family integrity and association is reflected in the very statutes at issue in this case.  The public interest in executing removal orders is outweighed where, as here, Petitioner is a law-abiding person, a resident in this country for eighteen years, a husband to a citizen wife, and a father to citizen children.  Accordingly, the Court concludes that all factors counsel in favor of a stay of removal and release.

## CONCLUSION

For the foregoing reasons, the Court concluded on June 20, 2018, that a stay of removal and release from custody pending the resolution of Petitioner's habeas petition were warranted to permit Petitioner to vindicate his rights and prevent irreparable injury.

SO ORDERED.

Dated: August 2, 2018
       New York, New York

_____
ANALISA TORRES
United States District Judge